# EUO OF LOUISE GRAVES

## EUO

## March 02, 2021



**Lindsey Perry, LCR,RPR, CRR**

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

_____

Videoconference Examination Under Oath of:

LOUISE GRAVES

Taken on behalf of Owners Insurance Company

March 2, 2021
Commencing at 9:23 a.m.

_____

Elite-Brentwood Reporting Services
www.elitereportingservices.com
Lindsey R. Perry, LCR, RPR, CRR, CSR
Post Office Box 292382
Nashville, Tennessee  37229
(615)595-0073

```
1              A   P   P   E   A   R   A   N   C   E   S

2


3


4    For Owners Insurance Company:

5              MR. BENJAMIN E. GOLDAMMER
                 Attorney at Law
6                Kay Griffin, PLLC
                 222 Second Avenue North, Suite 340M
7                Nashville, Tennessee  37201
                 (615)742-4800
8                ben.goldammer@kaygriffin.com

9


10


11   For the Insured, Louise Graves:

12             MR. RANDALL N. SONGSTAD
                 Attorney at Law
13               Songstad Law Firm
                 254 Court Avenue, Suite 505
14               Memphis, Tennessee  38103
                 (901)870-5500
15               randy@songstadlawfirm.com

16


17


18   Also Present:

19             MR. CHUCK GRAVES

20


21


22


23


24


25
```

```
                         I   N   D   E   X

                                                      Page

Examination                                             5
By Mr. Goldammer




                    E   X   H   I   B   I   T   S

                                                      Page

Exhibit No. 1                                          15
        Sworn Statement in Proof of Loss
        Signed June 1, 2018

Exhibit No. 2                                          17
        Sworn Statement in Proof of Loss
        Signed October 7, 2020

Exhibit No. 3                                          22
        Helping Hands General Contractors
        Estimate dated July 10, 2020
```

S T I P U L A T I O N S


                    The videoconference examination under

oath of LOUISE GRAVES was taken on behalf of Owners

Insurance Company, with all participants appearing

at their respective locations, on March 2, 2021, for

all purposes under the Tennessee Rules of Civil

Procedure.

                    It is agreed that LINDSEY R. PERRY, LCR,

RPR, CRR, CSR, Court Reporter for the State of

Tennessee, may swear the witness, and that the

reading and signing of the completed transcript by

the witness are not waived.

```
 1                    *    *    *

 2

 3             THE REPORTER:  Good morning.  My name is

 4   Lindsey Perry, licensed court reporter with

 5   Elite-Brentwood Reporting Services, LCR No. 790.

 6             Today's date is March 2, 2021, and the

 7   time is approximately 9:23 a.m. Central.  This is

 8   the examination under oath of Louise Graves.

 9             At this time, if any of the parties have

10   an objection to my administering the oath to the

11   witness via videoconference, please state your

12   objection now.

13

14                    *    *    *

15                    LOUISE GRAVES

16   was called as a witness, and after having been first

17   duly sworn, testified as follows:

18

19                    EXAMINATION

20   QUESTIONS BY MR. GOLDAMMER:

21   Q.        All right, ma'am.  My name is Ben Goldammer.

22   I represent Owners Insurance Company.  Hopefully

23   this will be pretty fast today.  I'm not going to

24   take up much of your time.

25             We're here today to take what's called an
```

```
 1    examination under oath, and it -- your lawyer has
 2    probably explained this to you, but what that means
 3    is that your insurance policy provides that the
 4    insurance company has the right to ask you questions
 5    under oath about the claim you have submitted.
 6             Do you understand that?
 7    A.       Yes.
 8    Q.       All right.  And you're represented by
 9    counsel here today who is Mr. Songstad; is that
10    correct?
11    A.       Yes.
12    Q.       At the end of this process, the court
13    reporter will type up everything you say and
14    everything I say.  You will then be given the
15    opportunity to review your transcript and make any
16    changes within 30 days, okay?
17    A.       Yes, sir.
18    Q.       All right.  Have you ever given a deposition
19    before?
20    A.       Nope, not that I remember.
21    Q.       Okay.  Well, I'll -- I used the word
22    "deposition" because I assume if I'd asked you if
23    you'd ever taken an examination under oath, you
24    would have said "no," but just a couple of things to
25    keep in mind.
```

```
 1          First off, you're under oath here today, and
 2    so obviously that means you have to tell the truth.
 3    I know you'll do that.  That's the first thing I
 4    tell everybody.
 5          Second is it's crucial that we communicate.
 6    So if you can't hear me -- because I notice you're
 7    kind of turning your head a little bit.  If you're
 8    having trouble or you don't understand my question,
 9    it's imperative that you tell me.
10          Does that make sense?
11    A.     Yes, sir.
12    Q.     Okay.  Because if you answer a question,
13    I'll assume you understood it.  And by the same
14    token, if you don't understand a question, I want
15    you to stop and tell me you don't understand, okay?
16    A.     Okay.  Yeah.  Okay.
17    Q.     Last, people have a natural habit of
18    communicating through headshakes or "uh-huh,"
19    "huh-uh."  If you do that, I'll probably say, you
20    know, "You have to say 'yes,'" or, "You have to say
21    'no.'"
22    A.     Okay.
23    Q.     It's not me trying to be rude to you, but
24    the court reporter can't type down a headshake.
25    A.     I understand.
```

```
 1    Q.      Okay.   The property that we're here to talk
 2    about today is 3525 East End Drive, right?
 3                  MR. GRAVES:  3523.
 4                  THE WITNESS:  Yeah, 3523.
 5    BY MR. GOLDAMMER:
 6    Q.      Yes, ma'am.
 7    A.      Yeah.  Uh-huh.  Yes.  Yes, sir.
 8    Q.      And when did you first purchase that
 9    property?
10    A.      I don't remember the year.  I don't know.
11    We was in business 37 years, but I don't remember
12    the year.  I don't know.  I haven't thought about
13    it.
14    Q.      Would it have been sometime in the
15    mid-1980s?
16    A.      Yes.  Correct.  Correct.
17    Q.      Do you remember how much you paid for the
18    property?
19    A.      No, sir.
20    Q.      Did you purchase the property with your
21    husband?
22    A.      Yes, sir.
23    Q.      And did you-all lease the property to
24    somebody else?  Did you run a business in the
25    property?  What did you do with it?
```

```
 1    A.      We ran a car dealership.

 2    Q.      And how long did you run a car dealership

 3    for?

 4    A.      30 years.  I mean, probably 30-some years.

 5    He's been gone 24 years.  He's been gone 24 years

 6    and -- 20 years -- close to -- I don't know.  35 or

 7    40 years.  I don't -- I haven't looked up dates.  I

 8    haven't -- I didn't know what you were going to ask

 9    me, so I don't know, but around that time.

10    Q.      That's all right.  If you don't know, "I

11    don't know," is a perfectly fine answer.

12    A.      Okay.  Okay.

13    Q.      So it sounds like you and your husband

14    bought the property in the mid-1980s, right?

15    A.      Yes, sir.

16    Q.      And you and your husband ran a car

17    dealership in the property for several years?

18    A.      Yes, sir.

19    Q.      At some point, did -- did -- was the

20    dealership turned over to a tenant, somebody else to

21    run the business?

22    A.      No.  We ran the dealership.  I was there,

23    you know, all the time.

24    Q.      When did you stop running the dealership?

25    A.      Oh, boy.  When was that?  About 2017.  About
```

```
 1   three years ago.  2017.

 2   Q.      And did somebody else take over the

 3   dealership three years ago?

 4   A.      Yes, sir.

 5   Q.      And who was that?

 6   A.      Jones Chevrolet.

 7   Q.      Got it.

 8           When you bought the property in 1984, how

 9   many buildings were on-site?

10   A.      The ones that are there now.

11   Q.      Got it.  Okay.  And that would be -- is that

12   two buildings?

13   A.      Yes, sir.

14   Q.      At any time from 1980 -- from mid-1980s

15   through the present, have you replaced the roof on

16   either of those buildings?

17   A.      Not to my knowledge.

18           MR. GRAVES:  Tell them you -- it's

19   been -- one was resealed and one was replaced.

20           MR. GOLDAMMER:  Sir, this is an

21   examination of --

22           MR. GRAVES:  I'm sorry.

23           MR. GOLDAMMER:  -- the insured.  That's

24   all right.  You're fine to stay and listen, but it's

25   her testimony here today.
```

```
 1              MR. GRAVES:  Okay.  I got you.  No
 2   problem.
 3   BY MR. GOLDAMMER:
 4   Q.       All right, ma'am.  So I put up what is a
 5   lease agreement, and there's a couple of extensions
 6   on the screen, and this is with CCC Jones Motor
 7   Holdings, LLC.
 8              I take it that is who took over the
 9   dealership?
10   A.       Jones, yes.  Uh-huh.  Yeah.  Jones Motor
11   Holdings, yes.  Uh-huh.
12   Q.       Okay.  And in -- well, first off, do you
13   know who put this lease together, who wrote this
14   lease?
15   A.       No, sir.
16   Q.       In paragraph -- or on page 2,
17   Paragraph 5(a), it provides your lessee, your
18   tenant, is going to maintain property damage
19   insurance with at least $300,000 in coverage.
20              Do you know if you ever received
21   certificates of insurance from your tenant for that
22   property damage insurance?
23   A.       I hate to sound dumb.  No, I don't know.
24   Q.       It's not dumb.  If you don't know the
25   answer, you don't know the answer.
```

```
 1              Do you know who Jones used as their
 2   insurance agent?
 3   A.      No, sir.
 4   Q.      In the 30-plus years that you owned the
 5   property, do you ever remember replacing siding or
 6   trim or soffits or fascia on the side of the
 7   building?
 8   A.      No, sir.  No memory of that -- to that.
 9   Q.      I made some requests last year related to
10   this lease and related to the insurance.
11              Do you -- did you ever go to your tenant in
12   response to those requests and ask for proof of the
13   insurance?
14   A.      No, sir.
15   Q.      In the 35-plus years that you owned the
16   property, do you ever remember replacing ceiling
17   tiles for the ceiling out in the shop area?
18   A.      No, sir.  I don't remember that.
19   Q.      All right.  My understanding is the property
20   was sold at the end of 2020; is that correct?
21   A.      Yes, sir.
22   Q.      For -- I think it was in December of 2020
23   for $325,000; is that right?
24   A.      Yes, sir.  Yes, sir.
25   Q.      And who was it sold to?
```

```
1    A.      I'm trying to think.  They're right down the
2    street.  I don't know.  Oh, I hate this.  It was --
3    Q.      It wasn't sold to the people who own -- it
4    wasn't sold to Jones Chevrolet, I take it?
5    A.      No, sir, it was not.  It was not, no.
6    Q.      As part of that sale, did the buyer receive
7    an assignment of your insurance claim?
8    A.      Don't know.
9    Q.      Have you negotiated any type of agreement
10   with the buyers of the property as to how the
11   insurance proceeds would be handled?
12   A.      I haven't negotiated with anyone.  I don't
13   do any of that stuff.
14   Q.      Who -- who was it that handled the
15   transaction?
16   A.      My --
17   Q.      Was there a lawyer involved to handle the
18   sale of the property?
19   A.      Oh, it was the real estate agent.  His name
20   is -- let me look in my phone here.  I'm trying
21   to -- I'm trying to find it.  I can't remember
22   names.  I just can't remember names anymore.  I'm
23   trying to find it.  Why can't I find it?  Contacts.
24   Winfred Allen.  He took care of the sale.
25   Q.      All right.  But you're saying you're not
```

1    aware of there being any agreement with the buyer to
2    split any part of the insurance proceeds?
3    A.      That's right.
4    Q.      Got it.
5    A.      I don't know anything about any agreement.
6    That's right.
7    Q.      Okay.  In the 35-plus years that you owned
8    the property, how many times do you remember there
9    being hailstorms at the property?
10   A.      Several.  Several times, yes.
11   Q.      All the way back to the mid-1980s?
12   A.      I don't remember.
13   Q.      And when you say "several times," "several"
14   will mean different things to different people.
15           Does that mean more than five, more than 20?
16   What does it mean?
17   A.      More than five.
18   Q.      Okay.  And is that more than five over the
19   35-plus-year period of time that you owned the
20   property, ma'am?
21   A.      I just don't remember.
22   Q.      Okay.  Now, there was an initial claim
23   involving this property from -- I'm going to show
24   you a document.  It's just taking a second to load.
25           There was an initial claim back in 2017.

```
 1    Actually, 20- -- yeah, 2017.  May of 2017.

 2            Do you remember this claim?

 3    A.      No, sir.

 4    Q.      Do you remember filing a lawsuit as part of

 5    a claim against Owners Insurance Company in 2017?

 6    A.      I don't remember.  I never got involved in

 7    any transactions.  I don't remember.

 8    Q.      Okay.  Well, this is a proof of loss dated

 9    June 1st, 2018.  And I'll zoom in for you, because I

10    can't figure out who signed it.

11            Do you know who signed this document for

12    you, ma'am?

13    A.      I can't read the writing.

14    Q.      Okay.

15    A.      I can't read this writing.  I don't know.

16    Q.      Do you remember there being a hailstorm on

17    or around May 27, 2017, at the East End Drive

18    property?

19    A.      No, sir.  I don't remember anything like

20    that.  I don't remember.

21            MR. GOLDAMMER:  Okay.  We'll mark this

22    as Exhibit 1.

23            (WHEREUPON, a document was marked as

24    Exhibit Number 1.)

25    //
```

BY MR. GOLDAMMER:

Q.     And I know some of these questions may sound repetitive given the answer to the last question you gave, but you just told me you don't recall a hailstorm in May of 2017, right?

A.     I just don't recall, no.

Q.     Okay.  And so I -- I assume you don't remember being out at the property during a hailstorm in May of 2017; is that correct?

A.     That's correct.

Q.     And I take it that you don't have any personal knowledge as to what damage, if any, may have been caused to the buildings as a result of that storm; is that correct?

A.     That's correct.

Q.     All right.  Thank you, ma'am.

Were you aware that a lawsuit had been filed over that claim?

A.     No.

Q.     All right.

A.     I just never got involved in that stuff.

Q.     All right.

This is a proof of loss from October 7, 2020.  This will be Exhibit 2.

//

```
 1              (WHEREUPON, a document was marked as
 2   Exhibit Number 2.)
 3   BY MR. GOLDAMMER:
 4   Q.      And this document, I believe, was signed by
 5   Mr. William Griffin.
 6              Do you see that?
 7   A.      Oh.  Well, you can't read it.
 8   Q.      Okay.  Well, that was actually going to be
 9   my next question, was whether you were aware of
10   Mr. Griffin signing this document.
11   A.      No, sir.
12   Q.      Have you ever reviewed this document before?
13   A.      Probably not, because I don't understand all
14   the small print.  I leave everything up to my son.
15   He just -- since my husband passed away, he takes
16   care of everything for me.
17   Q.      Yes, ma'am.
18              In this proof of loss, Mr. Griffin testifies
19   about a wind and hail event that occurred on or
20   around May 4, 2020.
21              Do you remember there being a wind and hail
22   event at the property on or around May 4, 2020?
23   A.      Not aware of it.
24   Q.      Are you able to testify as to any damage
25   that the property suffered as a result of a storm on
```

1    or around May 4, 2020?

2    A.        I'm not aware of it.  I'm just not aware of

3    any of this stuff.  I just -- I just don't get

4    involved in anything.  I leave everything up to my

5    son, and we weren't there in 2020.

6    Q.        I'm sorry, ma'am.  You broke up.  What did

7    you say about not being there?

8    A.        I just don't -- I'm not aware of anything.

9    And 2020 -- isn't that a few months ago?

10   Q.        Yeah, that would -- yeah, that would have, I

11   guess, been about 10 months ago, yes, ma'am.

12   A.        I'm just not aware of anything, as I stay

13   out there on the farm.  He takes care of everything.

14   I just go to him for everything.

15   Q.        Understood.

16             There -- the lease with Jones Chevrolet was

17   done in 2016.

18             From 2016 until you sold the property in

19   December of 2020, how often were you at the

20   property, ma'am?

21   A.        I worked there for a while, but then --

22   well, I worked there for a while.  It was every day

23   for a while, but when I retired, I stayed home and

24   stayed out of it.

25   Q.        Just to kind of circle back and put a bow on

```
 1    that, tell me if I'm wrong, but I think what you're
 2    saying is that after the dealership was taken over
 3    by Jones Chevrolet, you stayed on and worked for
 4    Jones Chevrolet for some period of time?
 5    A.      A few weeks.
 6    Q.      So that would have been --
 7    A.      They didn't want me.
 8    Q.      Okay.  That -- so that would have been a few
 9    weeks during 2016?  Does that sound right?
10    A.      I guess.  I didn't keep track of the dates.
11    I didn't keep track of the dates.
12    Q.      Well, and what -- the only thing I base that
13    on was just the fact that the -- the lease with
14    Jones Chevrolet --
15    A.      Uh-huh.
16    Q.      -- is dated August 5 of 2016.
17    A.      Right.
18    Q.      And so I assumed you worked for Jones
19    Chevrolet for a few weeks during 2016.
20            Does that kind of refresh your memory?
21    A.      Exactly, yes.  Exactly, yes.
22    Q.      And then after those few weeks of working
23    there, how much were you on-site after that?
24    A.      Just to pick up the rent check.
25    Q.      And was that monthly?
```

```
 1    A.      Yes.

 2    Q.      How far do you -- so they didn't mail the

 3    rent check.  You'd physically go down there and get

 4    it?

 5    A.      Yes, sir.

 6    Q.      How far do you live from the dealership?

 7    A.      Ten miles.

 8    Q.      When you stopped by to pick up the rent

 9    check, do you ever recall anybody from Jones

10    Chevrolet telling you about or complaining about

11    hail or storm damage?

12    A.      Leaks.

13    Q.      Okay.  And were those leaks that went back

14    to 2016 and 2017, ma'am?

15    A.      I don't know.  I don't know.  I just -- I --

16    I really don't know because I just turn everything

17    over to my son and I don't -- I don't know.

18    Q.      Who do you remember at Jones Chevrolet

19    complaining about leaks?

20    A.      I don't know.  I can't remember.  I don't

21    know.

22    Q.      During the period -- I'm sorry.  Did -- did

23    I cut somebody off?

24    A.      No, you just cut off for a second.

25    Q.      Got it.  Okay.
```

1      During the period of time that you ran the

2 dealership, so up till 2016, do you remember there

3 being leaks in the building?

4 A.      Yeah.   There was some ice storm or something

5 like that and it leaked, yeah.   Uh-huh.

6 Q.      And do you recall how far back that was?

7 A.      No, I do not.

8 Q.      Do you know if that damage was repaired?

9 A.      I -- I guess it was.   I don't know.

10 Q.      All right.   And again, if the answer is, "I

11 don't know," "I don't know" is a perfectly fine

12 answer.

13 A.      Okay.

14 Q.      In the summer of 2020, July of 2020, Helping

15 Hands General Contractors put together this estimate

16 that I've got in front of you on your screen.

17 A.      Okay.

18 Q.      Prior to today, have you ever seen this

19 document before?

20 A.      No, sir.

21 Q.      And if I fast-forward through it and go to

22 the photographs, there's some photographs.   For

23 example, page 32 of the document, there's some

24 indentations in the panelling.

25      Do you see that?

```
 1   A.      I do.

 2   Q.      Are you able to testify that that damage is

 3   attributable to a May 2020 storm event?

 4   A.      No, sir.  I don't know what happened.  I

 5   don't know what caused it.

 6   Q.      Okay.  And again, like I said, if the answer

 7   is you don't know, that's -- if that's the truth,

 8   that's the right answer is what I always tell

 9   people.

10           I've -- there's a lot of photographs.  It's

11   because it's a 70-page document, but I've, you know,

12   jumped to page 34, and there's a note on this

13   photograph about hail splatter -- hail spatter.  And

14   I'm happy to look at every photograph in here with

15   you, but if what you're going to tell me is that we

16   could look at all of them and you're not going to be

17   able to tell me what relates to a May 2020 storm and

18   what does not, then that will short-circuit this

19   process.

20   A.      I have no way of knowing.

21           MR. GOLDAMMER:  All right.  We'll mark

22   this as Exhibit 3.

23           (WHEREUPON, a document was marked as

24   Exhibit Number 3.)

25   //
```

```
1    BY MR. GOLDAMMER:

2    Q.       Was the decision to make a claim with Owners

3    Insurance Company for the 2020 storm, was that

4    something you came up with and decided to do or is

5    that something your son came up with?

6    A.       Not me.  I just leave all the business up to

7    him.  Everything.

8              MR. GOLDAMMER:  All right, ma'am.  Well,

9    I told you I would be fast, and so we've been fast

10   here today.  Like I told you at the beginning,

11   you'll get a chance to read and sign this.  The

12   court reporter will send it to your lawyer, and then

13   you'll have 30 days to review it and make any

14   changes you would like to make and swear to those

15   under oath, all right?

16             THE WITNESS:  Yes, sir.

17             MR. GOLDAMMER:  Thank you very much for

18   your time here today.

19             FURTHER DEPONENT SAITH NOT

20             (Proceedings concluded at 9:51 a.m.)

21

22

23

24

25
        Lindsey Perry * Elite-Brentwood Reporting Services *
```

1          E R R A T A   P A G E

2          I, LOUISE GRAVES, having read the foregoing
   examination under oath, Pages 1 through 23, do
3  hereby certify said testimony is a true and accurate
   transcript, with the following changes (if any):

4

5  PAGE   LINE              SHOULD HAVE BEEN

6  _____ _____   _____

7  _____ _____   _____

8  _____ _____   _____

9  _____ _____   _____

10 _____ _____   _____

11 _____ _____   _____

12 _____ _____   _____

13 _____ _____   _____

14 _____ _____   _____

15 _____ _____   _____

16 _____ _____   _____

17 _____ _____   _____

18

19

20            _____
              LOUISE GRAVES
21

22

   _____
23 Notary Public

24 My Commission Expires: _____

25 Reported by: Lindsey R. Perry, LCR, RPR, CRR, CSR
       Lindsey Perry * Elite-Brentwood Reporting Services *

REPORTER'S CERTIFICATE

STATE OF TENNESSEE

COUNTY OF WILLIAMSON

     I, LINDSEY R. PERRY, licensed court
reporter, with offices in Franklin, Tennessee,
hereby certify that I reported the foregoing
videoconference examination under oath of
LOUISE GRAVES by machine shorthand to the best of my
skills and abilities, and thereafter the same was
reduced to typewritten form by me.

     I further certify I am not related to any of
the parties named herein nor related to their
counsel and have no interest, financial or
otherwise, in the outcome of the proceedings.

I further certify that in order for this document to
be considered a true and correct copy, it must bear
my original signature and that any unauthorized
reproduction in whole or in part and/or transfer of
this document is not authorized, will not be
considered authentic, and will be in violation of
Tennessee Code Annotated 3-914-104, Theft of
Services.


LINDSEY R. PERRY, LCR, RPR, CRR, CSR
Licensed Court Reporter
Registered Professional Reporter
Certified Realtime Reporter
Certified Shorthand Reporter
State of Tennessee at Large

    LCR #790 - Expires:   6/30/2022

                                       25
Lindsey Perry * Elite-Brentwood Reporting Services *

**Exhibits**

**Ex 01 -**
  **Louise Graves**
  3:9 15:22,24
**Ex 02 -**
  **Louise Graves**
  3:11 16:24 17:2
**Ex 03 -**
  **Louise Graves**
  3:13 22:22,24

**$**

$300,000  11:19
$325,000  12:23

**1**

1  15:22,24
10  18:11
1980  10:14
1984  10:8
1st  15:9

**2**

2  5:6 11:16 16:24
  17:2
20  9:6 14:15
20-  15:1
2016  18:17,18
  19:9,16,19 20:14
  21:2
2017  9:25 10:1
  14:25 15:1,5,17
  16:5,9 20:14
2018  15:9
2020  12:20,22
  16:24 17:20,22
  18:1,5,9,19 21:14
  22:3,17 23:3
2021  5:6
24  9:5

**27**  15:17

**3**

3  22:22,24
30  6:16 9:4 23:13
30-plus  12:4
30-some  9:4
32  21:23
34  22:12
35  9:6
35-plus  12:15
  14:7
35-plus-year
  14:19
3523  8:3,4
3525  8:2
37  8:11

**4**

4  17:20,22 18:1
40  9:7

**5**

5  19:16
5(a)  11:17

**7**

7  16:23
70-page  22:11
790  5:5

**9**

9:23  5:7
9:51  23:20

**A**

a.m.  5:7 23:20

administering
  5:10
agent  12:2 13:19
agreement  11:5
  13:9 14:1,5
Allen  13:24
anymore  13:22
approximately
  5:7
area  12:17
assignment  13:7
assume  6:22 7:13
  16:7
assumed  19:18
attributable  22:3
August  19:16
aware  14:1 16:17
  17:9,23 18:2,8,12

**B**

back  14:11,25
  18:25 20:13 21:6
base  19:12
beginning  23:10
Ben  5:21
bit  7:7
bought  9:14 10:8
bow  18:25
boy  9:25
broke  18:6
building  12:7
  21:3
buildings  10:9,
  12,16 16:13
business  8:11,24
  9:21 23:6
buyer  13:6 14:1
buyers  13:10

**C**

called  5:16,25
car  9:1,2,16
care  13:24 17:16
  18:13
caused  16:13
  22:5
CCC  11:6
ceiling  12:16,17
Central  5:7
certificates  11:21
chance  23:11
check  19:24 20:3,
  9
Chevrolet  10:6
  13:4 18:16 19:3,4,
  14,19 20:10,18
circle  18:25
claim  6:5 13:7
  14:22,25 15:2,5
  16:18 23:2
close  9:6
communicate
  7:5
communicating
  7:18
company  5:22
  6:4 15:5 23:3
complaining
  20:10,19
concluded  23:20
Contacts  13:23
Contractors
  21:15
correct  6:10 8:16
  12:20 16:9,10,14,
  15
counsel  6:9
couple  6:24 11:5
court  5:4 6:12
  7:24 23:12

coverage 11:19
crucial 7:5
cut 20:23,24

---

**D**

damage 11:18,22
16:12 17:24 20:11
21:8 22:2
date 5:6
dated 15:8 19:16
dates 9:7 19:10,
11
day 18:22
days 6:16 23:13
dealership 9:1,2,
17,20,22,24 10:3
11:9 19:2 20:6
21:2
December 12:22
18:19
decided 23:4
decision 23:2
DEPONENT
23:19
deposition 6:18,
22
document 14:24
15:11,23 17:1,4,
10,12 21:19,23
22:11,23
Drive 8:2 15:17
duly 5:17
dumb 11:23,24

---

**E**

East 8:2 15:17
Elite-brentwood
5:5
end 6:12 8:2 12:20
15:17
estate 13:19

estimate 21:15
event 17:19,22
22:3
examination 5:8,
19 6:1,23 10:21
Exhibit 15:22,24
16:24 17:2 22:22,
24
explained 6:2
extensions 11:5

---

**F**

fact 19:13
farm 18:13
fascia 12:6
fast 5:23 23:9
fast-forward
21:21
figure 15:10
filed 16:17
filing 15:4
find 13:21,23
fine 9:11 10:24
21:11
front 21:16

---

**G**

gave 16:4
General 21:15
Goldammer 5:20,
21 8:5 10:20,23
11:3 15:21 16:1
17:3 22:21 23:1,8,
17
Good 5:3
Graves 5:8,15 8:3
10:18,22 11:1
Griffin 17:5,10,18
guess 18:11
19:10 21:9

---

**H**

habit 7:17
hail 17:19,21
20:11 22:13
hailstorm 15:16
16:5,9
hailstorms 14:9
handle 13:17
handled 13:11,14
Hands 21:15
happened 22:4
happy 22:14
hate 11:23 13:2
head 7:7
headshake 7:24
headshakes 7:18
hear 7:6
Helping 21:14
Holdings 11:7,11
home 18:23
huh-uh 7:19
husband 8:21
9:13,16 17:15

---

**I**

ice 21:4
imperative 7:9
indentations
21:24
initial 14:22,25
insurance 5:22
6:3,4 11:19,21,22
12:2,10,13 13:7,
11 14:2 15:5 23:3
insured 10:23
involved 13:17
15:6 16:21 18:4
involving 14:23

---

**J**

Jones 10:6 11:6,
10 12:1 13:4
18:16 19:3,4,14,
18 20:9,18
July 21:14
jumped 22:12
June 15:9

---

**K**

kind 7:7 18:25
19:20
knowing 22:20
knowledge 10:17
16:12

---

**L**

lawsuit 15:4
16:17
lawyer 6:1 13:17
23:12
LCR 5:5
leaked 21:5
leaks 20:12,13,19
21:3
lease 8:23 11:5,
13,14 12:10 18:16
19:13
leave 17:14 18:4
23:6
lessee 11:17
licensed 5:4
Lindsey 5:4
listen 10:24
live 20:6
LLC 11:7
load 14:24
long 9:2
looked 9:7

Elite-Brentwood Reporting Services    Index: coverage..lookedi2
Tel.: (615) 595-0073
www.EliteReportingServices.com

**loss** 15:8 16:23 17:18

**lot** 22:10

**Louise** 5:8,15

## M

**made** 12:9

**mail** 20:2

**maintain** 11:18

**make** 6:15 7:10 23:2,13,14

**March** 5:6

**mark** 15:21 22:21

**marked** 15:23 17:1 22:23

**means** 6:2 7:2

**memory** 12:8 19:20

**mid-1980s** 8:15 9:14 10:14 14:11

**miles** 20:7

**mind** 6:25

**monthly** 19:25

**months** 18:9,11

**morning** 5:3

**Motor** 11:6,10

## N

**names** 13:22

**natural** 7:17

**negotiated** 13:9, 12

**no.'** 7:21

**note** 22:12

**notice** 7:6

**Number** 15:24 17:2 22:24

## O

**oath** 5:8,10 6:1,5, 23 7:1 23:15

**objection** 5:10,12

**occurred** 17:19

**October** 16:23

**on-site** 10:9 19:23

**opportunity** 6:15

**owned** 12:4,15 14:7,19

**Owners** 5:22 15:5 23:2

## P

**paid** 8:17

**panelling** 21:24

**paragraph** 11:16, 17

**part** 13:6 14:2 15:4

**parties** 5:9

**passed** 17:15

**people** 7:17 13:3 14:14 22:9

**perfectly** 9:11 21:11

**period** 14:19 19:4 20:22 21:1

**Perry** 5:4

**personal** 16:12

**phone** 13:20

**photograph** 22:13,14

**photographs** 21:22 22:10

**physically** 20:3

**pick** 19:24 20:8

**point** 9:19

**policy** 6:3

**present** 10:15

**pretty** 5:23

**print** 17:14

**Prior** 21:18

**problem** 11:2

**proceedings** 23:20

**proceeds** 13:11 14:2

**process** 6:12 22:19

**proof** 12:12 15:8 16:23 17:18

**property** 8:1,9,18, 20,23,25 9:14,17 10:8 11:18,22 12:5,16,19 13:10, 18 14:8,9,20,23 15:18 16:8 17:22, 25 18:18,20

**purchase** 8:8,20

**put** 11:4,13 18:25 21:15

## Q

**question** 7:8,12, 14 16:3 17:9

**questions** 5:20 6:4 16:2

## R

**ran** 9:1,16,22 21:1

**read** 15:13,15 17:7 23:11

**real** 13:19

**recall** 16:4,6 20:9 21:6

**receive** 13:6

**received** 11:20

**refresh** 19:20

**related** 12:9,10

**relates** 22:17

**remember** 6:20 8:10,11,17 12:5, 16,18 13:21,22 14:8,12,21 15:2,4, 6,7,16,19,20 16:8 17:21 20:18,20 21:2

**rent** 19:24 20:3,8

**repaired** 21:8

**repetitive** 16:3

**replaced** 10:15, 19

**replacing** 12:5,16

**reporter** 5:3,4 6:13 7:24 23:12

**Reporting** 5:5

**represent** 5:22

**represented** 6:8

**requests** 12:9,12

**resealed** 10:19

**response** 12:12

**result** 16:13 17:25

**retired** 18:23

**review** 6:15 23:13

**reviewed** 17:12

**roof** 10:15

**rude** 7:23

**run** 8:24 9:2,21

**running** 9:24

## S

**SAITH** 23:19

**sale** 13:6,18,24

**screen** 11:6 21:16

**send** 23:12

**sense** 7:10

**Services** 5:5

**shop** 12:17

**short-circuit** 22:18

Elite-Brentwood Reporting Services, LLC (615) 595-0073
Index: *10 (615)..short-circuit3
www.EliteReportingServices.com

show 14:23

side 12:6

siding 12:5

sign 23:11

signed 15:10,11
17:4

signing 17:10

sir 6:17 7:11 8:7,
19,22 9:15,18
10:4,13,20 11:15
12:3,8,14,18,21,
24 13:5 15:3,19
17:11 20:5 21:20
22:4 23:16

small 17:14

soffits 12:6

sold 12:20,25
13:3,4 18:18

son 17:14 18:5
20:17 23:5

Songstad 6:9

sound 11:23 16:2
19:9

sounds 9:13

spatter 22:13

splatter 22:13

split 14:2

state 5:11

stay 10:24 18:12

stayed 18:23,24
19:3

stop 7:15 9:24

stopped 20:8

storm 16:14 17:25
20:11 21:4 22:3,
17 23:3

street 13:2

stuff 13:13 16:21
18:3

submitted 6:5

suffered 17:25

summer 21:14

swear 23:14

sworn 5:17

---

**T**

takes 17:15 18:13

taking 14:24

talk 8:1

telling 20:10

Ten 20:7

tenant 9:20 11:18,
21 12:11

testified 5:17

testifies 17:18

testify 17:24 22:2

testimony 10:25

thing 7:3 19:12

things 6:24 14:14

thought 8:12

tiles 12:17

till 21:2

time 5:7,9,24 9:9,
23 10:14 14:19
19:4 21:1 23:18

times 14:8,10,13

today 5:23,25 6:9
7:1 8:2 10:25
21:18 23:10,18

Today's 5:6

token 7:14

told 16:4 23:9,10

track 19:10,11

transaction
13:15

transactions
15:7

transcript 6:15

trim 12:6

trouble 7:8

truth 7:2 22:7

turn 20:16

turned 9:20

turning 7:7

type 6:13 7:24
13:9

---

**U**

uh-huh 7:18 8:7
11:10,11 19:15
21:5

understand 6:6
7:8,14,15,25
17:13

understanding
12:19

understood 7:13
18:15

---

**V**

videoconference
5:11

---

**W**

weeks 19:5,9,19,
22

William 17:5

wind 17:19,21

Winfred 13:24

word 6:21

worked 18:21,22
19:3,18

working 19:22

writing 15:13,15

wrong 19:1

wrote 11:13

---

**Y**

year 8:10,12 12:9

years 8:11 9:4,5,
6,7,17 10:1,3
12:4,15 14:7

yes,' 7:20

you-all 8:23

---

**Z**

zoom 15:9