# EUO OF LOUISE GRAVES

# EUO

# March 02, 2021



Lindsey Perry, LCR,RPR, CRR

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

1

_____

2

3

4

5

6

7

8

9

10        Videoconference Examination Under Oath of:

11        LOUISE GRAVES

12        Taken on behalf of Owners Insurance Company

13        March 2, 2021
          Commencing at 9:23 a.m.

14

15

16

17

18

19

20

21

_____

22

23              Elite-Brentwood Reporting Services
                www.elitereportingservices.com
                Lindsey R. Perry, LCR, RPR, CRR, CSR
24                   Post Office Box 292382
                  Nashville, Tennessee  37229
25                      (615)595-0073

```
1               A  P  P  E  A  R  A  N  C  E  S

2

3

4    For Owners Insurance Company:

5               MR. BENJAMIN E. GOLDAMMER
                Attorney at Law
6               Kay Griffin, PLLC
                222 Second Avenue North, Suite 340M
7               Nashville, Tennessee  37201
                (615)742-4800
8               ben.goldammer@kaygriffin.com

9

10

11   For the Insured, Louise Graves:

12               MR. RANDALL N. SONGSTAD
                Attorney at Law
13               Songstad Law Firm
                254 Court Avenue, Suite 505
14               Memphis, Tennessee  38103
                (901)870-5500
15               randy@songstadlawfirm.com

16

17

18   Also Present:

19               MR. CHUCK GRAVES

20

21

22

23

24

25
```

```
1                    I  N  D  E  X

2                                              Page

3    Examination                                 5
     By Mr. Goldammer
4

5

6

7                 E  X  H  I  B  I  T  S

8                                              Page

9    Exhibit No. 1                              15
          Sworn Statement in Proof of Loss
10        Signed June 1, 2018

11   Exhibit No. 2                              17
          Sworn Statement in Proof of Loss
12        Signed October 7, 2020

13   Exhibit No. 3                              22
          Helping Hands General Contractors
14        Estimate dated July 10, 2020

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            S  T  I  P  U  L  A  T  I  O  N  S

 2

 3

 4

 5            The videoconference examination under

 6    oath of LOUISE GRAVES was taken on behalf of Owners

 7    Insurance Company, with all participants appearing

 8    at their respective locations, on March 2, 2021, for

 9    all purposes under the Tennessee Rules of Civil

10    Procedure.

11            It is agreed that LINDSEY R. PERRY, LCR,

12    RPR, CRR, CSR, Court Reporter for the State of

13    Tennessee, may swear the witness, and that the

14    reading and signing of the completed transcript by

15    the witness are not waived.

16

17

18

19

20

21

22

23

24

25
```

```
 1                    *    *    *

 2

 3            THE REPORTER:  Good morning.  My name is

 4    Lindsey Perry, licensed court reporter with

 5    Elite-Brentwood Reporting Services, LCR No. 790.

 6            Today's date is March 2, 2021, and the

 7    time is approximately 9:23 a.m. Central.  This is

 8    the examination under oath of Louise Graves.

 9            At this time, if any of the parties have

10    an objection to my administering the oath to the

11    witness via videoconference, please state your

12    objection now.

13

14                    *    *    *

15                    LOUISE GRAVES

16    was called as a witness, and after having been first

17    duly sworn, testified as follows:

18

19                    EXAMINATION

20    QUESTIONS BY MR. GOLDAMMER:

21    Q.       All right, ma'am.  My name is Ben Goldammer.

22    I represent Owners Insurance Company.  Hopefully

23    this will be pretty fast today.  I'm not going to

24    take up much of your time.

25            We're here today to take what's called an
```

1    examination under oath, and it -- your lawyer has

2    probably explained this to you, but what that means

3    is that your insurance policy provides that the

4    insurance company has the right to ask you questions

5    under oath about the claim you have submitted.

6            Do you understand that?

7    A.      Yes.

8    Q.      All right.  And you're represented by

9    counsel here today who is Mr. Songstad; is that

10   correct?

11   A.      Yes.

12   Q.      At the end of this process, the court

13   reporter will type up everything you say and

14   everything I say.  You will then be given the

15   opportunity to review your transcript and make any

16   changes within 30 days, okay?

17   A.      Yes, sir.

18   Q.      All right.  Have you ever given a deposition

19   before?

20   A.      Nope, not that I remember.

21   Q.      Okay.  Well, I'll -- I used the word

22   "deposition" because I assume if I'd asked you if

23   you'd ever taken an examination under oath, you

24   would have said "no," but just a couple of things to

25   keep in mind.

```
 1          First off, you're under oath here today, and

 2     so obviously that means you have to tell the truth.

 3     I know you'll do that.  That's the first thing I

 4     tell everybody.

 5          Second is it's crucial that we communicate.

 6     So if you can't hear me -- because I notice you're

 7     kind of turning your head a little bit.  If you're

 8     having trouble or you don't understand my question,

 9     it's imperative that you tell me.

10          Does that make sense?

11     A.     Yes, sir.

12     Q.     Okay.  Because if you answer a question,

13     I'll assume you understood it.  And by the same

14     token, if you don't understand a question, I want

15     you to stop and tell me you don't understand, okay?

16     A.     Okay.  Yeah.  Okay.

17     Q.     Last, people have a natural habit of

18     communicating through headshakes or "uh-huh,"

19     "huh-uh."  If you do that, I'll probably say, you

20     know, "You have to say 'yes,'" or, "You have to say

21     'no.'"

22     A.     Okay.

23     Q.     It's not me trying to be rude to you, but

24     the court reporter can't type down a headshake.

25     A.     I understand.
```

```
 1    Q.      Okay.  The property that we're here to talk
 2    about today is 3525 East End Drive, right?
 3                  MR. GRAVES:  3523.
 4                  THE WITNESS:  Yeah, 3523.
 5    BY MR. GOLDAMMER:
 6    Q.      Yes, ma'am.
 7    A.      Yeah.  Uh-huh.  Yes.  Yes, sir.
 8    Q.      And when did you first purchase that
 9    property?
10    A.      I don't remember the year.  I don't know.
11    We was in business 37 years, but I don't remember
12    the year.  I don't know.  I haven't thought about
13    it.
14    Q.      Would it have been sometime in the
15    mid-1980s?
16    A.      Yes.  Correct.  Correct.
17    Q.      Do you remember how much you paid for the
18    property?
19    A.      No, sir.
20    Q.      Did you purchase the property with your
21    husband?
22    A.      Yes, sir.
23    Q.      And did you-all lease the property to
24    somebody else?  Did you run a business in the
25    property?  What did you do with it?
```

```
 1   A.      We ran a car dealership.

 2   Q.      And how long did you run a car dealership

 3   for?

 4   A.      30 years.  I mean, probably 30-some years.

 5   He's been gone 24 years.  He's been gone 24 years

 6   and -- 20 years -- close to -- I don't know.  35 or

 7   40 years.  I don't -- I haven't looked up dates.  I

 8   haven't -- I didn't know what you were going to ask

 9   me, so I don't know, but around that time.

10   Q.      That's all right.  If you don't know, "I

11   don't know," is a perfectly fine answer.

12   A.      Okay.  Okay.

13   Q.      So it sounds like you and your husband

14   bought the property in the mid-1980s, right?

15   A.      Yes, sir.

16   Q.      And you and your husband ran a car

17   dealership in the property for several years?

18   A.      Yes, sir.

19   Q.      At some point, did -- did -- was the

20   dealership turned over to a tenant, somebody else to

21   run the business?

22   A.      No.  We ran the dealership.  I was there,

23   you know, all the time.

24   Q.      When did you stop running the dealership?

25   A.      Oh, boy.  When was that?  About 2017.  About
```

1    three years ago.  2017.

2    Q.       And did somebody else take over the

3    dealership three years ago?

4    A.       Yes, sir.

5    Q.       And who was that?

6    A.       Jones Chevrolet.

7    Q.       Got it.

8             When you bought the property in 1984, how

9    many buildings were on-site?

10   A.       The ones that are there now.

11   Q.       Got it.  Okay.  And that would be -- is that

12   two buildings?

13   A.       Yes, sir.

14   Q.       At any time from 1980 -- from mid-1980s

15   through the present, have you replaced the roof on

16   either of those buildings?

17   A.       Not to my knowledge.

18            MR. GRAVES:  Tell them you -- it's

19   been -- one was resealed and one was replaced.

20            MR. GOLDAMMER:  Sir, this is an

21   examination of --

22            MR. GRAVES:  I'm sorry.

23            MR. GOLDAMMER:  -- the insured.  That's

24   all right.  You're fine to stay and listen, but it's

25   her testimony here today.

```
 1              MR. GRAVES:  Okay.  I got you.  No

 2     problem.

 3     BY MR. GOLDAMMER:

 4     Q.      All right, ma'am.  So I put up what is a

 5     lease agreement, and there's a couple of extensions

 6     on the screen, and this is with CCC Jones Motor

 7     Holdings, LLC.

 8              I take it that is who took over the

 9     dealership?

10     A.      Jones, yes.  Uh-huh.  Yeah.  Jones Motor

11     Holdings, yes.  Uh-huh.

12     Q.      Okay.  And in -- well, first off, do you

13     know who put this lease together, who wrote this

14     lease?

15     A.      No, sir.

16     Q.      In paragraph -- or on page 2,

17     Paragraph 5(a), it provides your lessee, your

18     tenant, is going to maintain property damage

19     insurance with at least $300,000 in coverage.

20              Do you know if you ever received

21     certificates of insurance from your tenant for that

22     property damage insurance?

23     A.      I hate to sound dumb.  No, I don't know.

24     Q.      It's not dumb.  If you don't know the

25     answer, you don't know the answer.
```

```
 1          Do you know who Jones used as their

 2    insurance agent?

 3    A.       No, sir.

 4    Q.       In the 30-plus years that you owned the

 5    property, do you ever remember replacing siding or

 6    trim or soffits or fascia on the side of the

 7    building?

 8    A.       No, sir.  No memory of that -- to that.

 9    Q.       I made some requests last year related to

10    this lease and related to the insurance.

11          Do you -- did you ever go to your tenant in

12    response to those requests and ask for proof of the

13    insurance?

14    A.       No, sir.

15    Q.       In the 35-plus years that you owned the

16    property, do you ever remember replacing ceiling

17    tiles for the ceiling out in the shop area?

18    A.       No, sir.  I don't remember that.

19    Q.       All right.  My understanding is the property

20    was sold at the end of 2020; is that correct?

21    A.       Yes, sir.

22    Q.       For -- I think it was in December of 2020

23    for $325,000; is that right?

24    A.       Yes, sir.  Yes, sir.

25    Q.       And who was it sold to?
```

1    A.        I'm trying to think.  They're right down the
2    street.  I don't know.  Oh, I hate this.  It was --
3    Q.        It wasn't sold to the people who own -- it
4    wasn't sold to Jones Chevrolet, I take it?
5    A.        No, sir, it was not.  It was not, no.
6    Q.        As part of that sale, did the buyer receive
7    an assignment of your insurance claim?
8    A.        Don't know.
9    Q.        Have you negotiated any type of agreement
10   with the buyers of the property as to how the
11   insurance proceeds would be handled?
12   A.        I haven't negotiated with anyone.  I don't
13   do any of that stuff.
14   Q.        Who -- who was it that handled the
15   transaction?
16   A.        My --
17   Q.        Was there a lawyer involved to handle the
18   sale of the property?
19   A.        Oh, it was the real estate agent.  His name
20   is -- let me look in my phone here.  I'm trying
21   to -- I'm trying to find it.  I can't remember
22   names.  I just can't remember names anymore.  I'm
23   trying to find it.  Why can't I find it?  Contacts.
24   Winfred Allen.  He took care of the sale.
25   Q.        All right.  But you're saying you're not

```
1    aware of there being any agreement with the buyer to

2    split any part of the insurance proceeds?

3    A.      That's right.

4    Q.      Got it.

5    A.      I don't know anything about any agreement.

6    That's right.

7    Q.      Okay.  In the 35-plus years that you owned

8    the property, how many times do you remember there

9    being hailstorms at the property?

10   A.      Several.  Several times, yes.

11   Q.      All the way back to the mid-1980s?

12   A.      I don't remember.

13   Q.      And when you say "several times," "several"

14   will mean different things to different people.

15           Does that mean more than five, more than 20?

16   What does it mean?

17   A.      More than five.

18   Q.      Okay.  And is that more than five over the

19   35-plus-year period of time that you owned the

20   property, ma'am?

21   A.      I just don't remember.

22   Q.      Okay.  Now, there was an initial claim

23   involving this property from -- I'm going to show

24   you a document.  It's just taking a second to load.

25           There was an initial claim back in 2017.
```

1  Actually, 20- -- yeah, 2017.  May of 2017.

2          Do you remember this claim?

3  A.       No, sir.

4  Q.       Do you remember filing a lawsuit as part of

5  a claim against Owners Insurance Company in 2017?

6  A.       I don't remember.  I never got involved in

7  any transactions.  I don't remember.

8  Q.       Okay.  Well, this is a proof of loss dated

9  June 1st, 2018.  And I'll zoom in for you, because I

10  can't figure out who signed it.

11          Do you know who signed this document for

12  you, ma'am?

13  A.       I can't read the writing.

14  Q.       Okay.

15  A.       I can't read this writing.  I don't know.

16  Q.       Do you remember there being a hailstorm on

17  or around May 27, 2017, at the East End Drive

18  property?

19  A.       No, sir.  I don't remember anything like

20  that.  I don't remember.

21             MR. GOLDAMMER:  Okay.  We'll mark this

22  as Exhibit 1.

23             (WHEREUPON, a document was marked as

24  Exhibit Number 1.)

25  //

BY MR. GOLDAMMER:

Q.    And I know some of these questions may sound repetitive given the answer to the last question you gave, but you just told me you don't recall a hailstorm in May of 2017, right?

A.    I just don't recall, no.

Q.    Okay.  And so I -- I assume you don't remember being out at the property during a hailstorm in May of 2017; is that correct?

A.    That's correct.

Q.    And I take it that you don't have any personal knowledge as to what damage, if any, may have been caused to the buildings as a result of that storm; is that correct?

A.    That's correct.

Q.    All right.  Thank you, ma'am.

      Were you aware that a lawsuit had been filed over that claim?

A.    No.

Q.    All right.

A.    I just never got involved in that stuff.

Q.    All right.

      This is a proof of loss from October 7, 2020.  This will be Exhibit 2.

//

```
 1              (WHEREUPON, a document was marked as

 2   Exhibit Number 2.)

 3   BY MR. GOLDAMMER:

 4   Q.     And this document, I believe, was signed by

 5   Mr. William Griffin.

 6              Do you see that?

 7   A.     Oh.  Well, you can't read it.

 8   Q.     Okay.  Well, that was actually going to be

 9   my next question, was whether you were aware of

10   Mr. Griffin signing this document.

11   A.     No, sir.

12   Q.     Have you ever reviewed this document before?

13   A.     Probably not, because I don't understand all

14   the small print.  I leave everything up to my son.

15   He just -- since my husband passed away, he takes

16   care of everything for me.

17   Q.     Yes, ma'am.

18              In this proof of loss, Mr. Griffin testifies

19   about a wind and hail event that occurred on or

20   around May 4, 2020.

21              Do you remember there being a wind and hail

22   event at the property on or around May 4, 2020?

23   A.     Not aware of it.

24   Q.     Are you able to testify as to any damage

25   that the property suffered as a result of a storm on
```

1    or around May 4, 2020?

2    A.      I'm not aware of it.  I'm just not aware of

3    any of this stuff.  I just -- I just don't get

4    involved in anything.  I leave everything up to my

5    son, and we weren't there in 2020.

6    Q.      I'm sorry, ma'am.  You broke up.  What did

7    you say about not being there?

8    A.      I just don't -- I'm not aware of anything.

9    And 2020 -- isn't that a few months ago?

10   Q.      Yeah, that would -- yeah, that would have, I

11   guess, been about 10 months ago, yes, ma'am.

12   A.      I'm just not aware of anything, as I stay

13   out there on the farm.  He takes care of everything.

14   I just go to him for everything.

15   Q.      Understood.

16           There -- the lease with Jones Chevrolet was

17   done in 2016.

18           From 2016 until you sold the property in

19   December of 2020, how often were you at the

20   property, ma'am?

21   A.      I worked there for a while, but then --

22   well, I worked there for a while.  It was every day

23   for a while, but when I retired, I stayed home and

24   stayed out of it.

25   Q.      Just to kind of circle back and put a bow on

```
 1    that, tell me if I'm wrong, but I think what you're

 2    saying is that after the dealership was taken over

 3    by Jones Chevrolet, you stayed on and worked for

 4    Jones Chevrolet for some period of time?

 5    A.      A few weeks.

 6    Q.      So that would have been --

 7    A.      They didn't want me.

 8    Q.      Okay.  That -- so that would have been a few

 9    weeks during 2016?  Does that sound right?

10    A.      I guess.  I didn't keep track of the dates.

11    I didn't keep track of the dates.

12    Q.      Well, and what -- the only thing I base that

13    on was just the fact that the -- the lease with

14    Jones Chevrolet --

15    A.      Uh-huh.

16    Q.      -- is dated August 5 of 2016.

17    A.      Right.

18    Q.      And so I assumed you worked for Jones

19    Chevrolet for a few weeks during 2016.

20            Does that kind of refresh your memory?

21    A.      Exactly, yes.  Exactly, yes.

22    Q.      And then after those few weeks of working

23    there, how much were you on-site after that?

24    A.      Just to pick up the rent check.

25    Q.      And was that monthly?
```

```
 1   A.      Yes.

 2   Q.      How far do you -- so they didn't mail the

 3   rent check.  You'd physically go down there and get

 4   it?

 5   A.      Yes, sir.

 6   Q.      How far do you live from the dealership?

 7   A.      Ten miles.

 8   Q.      When you stopped by to pick up the rent

 9   check, do you ever recall anybody from Jones

10   Chevrolet telling you about or complaining about

11   hail or storm damage?

12   A.      Leaks.

13   Q.      Okay.  And were those leaks that went back

14   to 2016 and 2017, ma'am?

15   A.      I don't know.  I don't know.  I just -- I --

16   I really don't know because I just turn everything

17   over to my son and I don't -- I don't know.

18   Q.      Who do you remember at Jones Chevrolet

19   complaining about leaks?

20   A.      I don't know.  I can't remember.  I don't

21   know.

22   Q.      During the period -- I'm sorry.  Did -- did

23   I cut somebody off?

24   A.      No, you just cut off for a second.

25   Q.      Got it.  Okay.
```

1    During the period of time that you ran the

2    dealership, so up till 2016, do you remember there

3    being leaks in the building?

4    A.    Yeah.  There was some ice storm or something

5    like that and it leaked, yeah.  Uh-huh.

6    Q.    And do you recall how far back that was?

7    A.    No, I do not.

8    Q.    Do you know if that damage was repaired?

9    A.    I -- I guess it was.  I don't know.

10   Q.    All right.  And again, if the answer is, "I

11   don't know," "I don't know" is a perfectly fine

12   answer.

13   A.    Okay.

14   Q.    In the summer of 2020, July of 2020, Helping

15   Hands General Contractors put together this estimate

16   that I've got in front of you on your screen.

17   A.    Okay.

18   Q.    Prior to today, have you ever seen this

19   document before?

20   A.    No, sir.

21   Q.    And if I fast-forward through it and go to

22   the photographs, there's some photographs.  For

23   example, page 32 of the document, there's some

24   indentations in the panelling.

25       Do you see that?

```
1    A.      I do.

2    Q.      Are you able to testify that that damage is

3    attributable to a May 2020 storm event?

4    A.      No, sir.  I don't know what happened.  I

5    don't know what caused it.

6    Q.      Okay.  And again, like I said, if the answer

7    is you don't know, that's -- if that's the truth,

8    that's the right answer is what I always tell

9    people.

10           I've -- there's a lot of photographs.  It's

11   because it's a 70-page document, but I've, you know,

12   jumped to page 34, and there's a note on this

13   photograph about hail splatter -- hail spatter.  And

14   I'm happy to look at every photograph in here with

15   you, but if what you're going to tell me is that we

16   could look at all of them and you're not going to be

17   able to tell me what relates to a May 2020 storm and

18   what does not, then that will short-circuit this

19   process.

20   A.      I have no way of knowing.

21           MR. GOLDAMMER:  All right.  We'll mark

22   this as Exhibit 3.

23           (WHEREUPON, a document was marked as

24   Exhibit Number 3.)

25   //
```

```
1    BY MR. GOLDAMMER:

2    Q.      Was the decision to make a claim with Owners

3    Insurance Company for the 2020 storm, was that

4    something you came up with and decided to do or is

5    that something your son came up with?

6    A.      Not me.  I just leave all the business up to

7    him.  Everything.

8               MR. GOLDAMMER:  All right, ma'am.  Well,

9    I told you I would be fast, and so we've been fast

10   here today.  Like I told you at the beginning,

11   you'll get a chance to read and sign this.  The

12   court reporter will send it to your lawyer, and then

13   you'll have 30 days to review it and make any

14   changes you would like to make and swear to those

15   under oath, all right?

16               THE WITNESS:  Yes, sir.

17               MR. GOLDAMMER:  Thank you very much for

18   your time here today.

19               FURTHER DEPONENT SAITH NOT

20               (Proceedings concluded at 9:51 a.m.)

21

22

23

24

25

        Lindsey Perry * Elite-Brentwood Reporting Services *
```

E R R A T A   P A G E

          I, LOUISE GRAVES, having read the foregoing
     examination under oath, Pages 1 through 23, do
     hereby certify said testimony is a true and accurate
     transcript, with the following changes (if any):


     PAGE    LINE            SHOULD HAVE BEEN

     _____  _____   _____

     _____  _____   _____

     _____  _____   _____

     _____  _____   _____

     _____  _____   _____

     _____  _____   _____

     _____  _____   _____

     _____  _____   _____

     _____  _____   _____

     _____  _____   _____

     _____  _____   _____

     _____  _____   _____




                    _____
                    LOUISE GRAVES



     _____
     Notary Public

     My Commission Expires: _____

     Reported by: Lindsey R. Perry, LCR, RPR, CRR, CSR
          Lindsey Perry * Elite-Brentwood Reporting Services *

1                    REPORTER'S CERTIFICATE

2    STATE OF TENNESSEE

3    COUNTY OF WILLIAMSON

4            I, LINDSEY R. PERRY, licensed court

5    reporter, with offices in Franklin, Tennessee,

6    hereby certify that I reported the foregoing

7    videoconference examination under oath of

8    LOUISE GRAVES by machine shorthand to the best of my

9    skills and abilities, and thereafter the same was

10   reduced to typewritten form by me.

11           I further certify I am not related to any of

12   the parties named herein nor related to their

13   counsel and have no interest, financial or

14   otherwise, in the outcome of the proceedings.

15   I further certify that in order for this document to
     be considered a true and correct copy, it must bear
16   my original signature and that any unauthorized
     reproduction in whole or in part and/or transfer of
17   this document is not authorized, will not be
     considered authentic, and will be in violation of
18   Tennessee Code Annotated 3-914-104, Theft of
     Services.

19

20

21
         LINDSEY R. PERRY, LCR, RPR, CRR, CSR
22       Licensed Court Reporter
         Registered Professional Reporter
23       Certified Realtime Reporter
         Certified Shorthand Reporter
24       State of Tennessee at Large

25       LCR #790 - Expires:    6/30/2022
                                        25
       Lindsey Perry * Elite-Brentwood Reporting Services *

**Exhibits**

**Ex 01 -**
  **Louise Graves**
  3:9 15:22,24
**Ex 02 -**
  **Louise Graves**
  3:11 16:24 17:2
**Ex 03 -**
  **Louise Graves**
  3:13 22:22,24

---

**$**

**$300,000** 11:19
**$325,000** 12:23

---

**1**

**1** 15:22,24
**10** 18:11
**1980** 10:14
**1984** 10:8
**1st** 15:9

---

**2**

**2** 5:6 11:16 16:24
17:2
**20** 9:6 14:15
**20-** 15:1
**2016** 18:17,18
19:9,16,19 20:14
21:2
**2017** 9:25 10:1
14:25 15:1,5,17
16:5,9 20:14
**2018** 15:9
**2020** 12:20,22
16:24 17:20,22
18:1,5,9,19 21:14
22:3,17 23:3
**2021** 5:6
**24** 9:5

**27** 15:17

---

**3**

**3** 22:22,24
**30** 6:16 9:4 23:13
**30-plus** 12:4
**30-some** 9:4
**32** 21:23
**34** 22:12
**35** 9:6
**35-plus** 12:15
14:7
**35-plus-year**
14:19
**3523** 8:3,4
**3525** 8:2
**37** 8:11

---

**4**

**4** 17:20,22 18:1
**40** 9:7

---

**5**

**5** 19:16
**5(a)** 11:17

---

**7**

**7** 16:23
**70-page** 22:11
**790** 5:5

---

**9**

**9:23** 5:7
**9:51** 23:20

---

**A**

**a.m.** 5:7 23:20

**administering**
5:10
**agent** 12:2 13:19
**agreement** 11:5
13:9 14:1,5
**Allen** 13:24
**anymore** 13:22
**approximately**
5:7
**area** 12:17
**assignment** 13:7
**assume** 6:22 7:13
16:7
**assumed** 19:18
**attributable** 22:3
**August** 19:16
**aware** 14:1 16:17
17:9,23 18:2,8,12

---

**B**

**back** 14:11,25
18:25 20:13 21:6
**base** 19:12
**beginning** 23:10
**Ben** 5:21
**bit** 7:7
**bought** 9:14 10:8
**bow** 18:25
**boy** 9:25
**broke** 18:6
**building** 12:7
21:3
**buildings** 10:9,
12,16 16:13
**business** 8:11,24
9:21 23:6
**buyer** 13:6 14:1
**buyers** 13:10

---

**C**

**called** 5:16,25
**car** 9:1,2,16
**care** 13:24 17:16
18:13
**caused** 16:13
22:5
**CCC** 11:6
**ceiling** 12:16,17
**Central** 5:7
**certificates** 11:21
**chance** 23:11
**check** 19:24 20:3,
9
**Chevrolet** 10:6
13:4 18:16 19:3,4,
14,19 20:10,18
**circle** 18:25
**claim** 6:5 13:7
14:22,25 15:2,5
16:18 23:2
**close** 9:6
**communicate**
7:5
**communicating**
7:18
**company** 5:22
6:4 15:5 23:3
**complaining**
20:10,19
**concluded** 23:20
**Contacts** 13:23
**Contractors**
21:15
**correct** 6:10 8:16
12:20 16:9,10,14,
15
**counsel** 6:9
**couple** 6:24 11:5
**court** 5:4 6:12
7:24 23:12

**coverage** 11:19

**crucial** 7:5

**cut** 20:23,24

---

**D**

**damage** 11:18,22
16:12 17:24 20:11
21:8 22:2

**date** 5:6

**dated** 15:8 19:16

**dates** 9:7 19:10,
11

**day** 18:22

**days** 6:16 23:13

**dealership** 9:1,2,
17,20,22,24 10:3
11:9 19:2 20:6
21:2

**December** 12:22
18:19

**decided** 23:4

**decision** 23:2

**DEPONENT**
23:19

**deposition** 6:18,
22

**document** 14:24
15:11,23 17:1,4,
10,12 21:19,23
22:11,23

**Drive** 8:2 15:17

**duly** 5:17

**dumb** 11:23,24

---

**E**

**East** 8:2 15:17

**Elite-brentwood**
5:5

**end** 6:12 8:2 12:20
15:17

**estate** 13:19

**estimate** 21:15

**event** 17:19,22
22:3

**examination** 5:8,
19 6:1,23 10:21

**Exhibit** 15:22,24
16:24 17:2 22:22,
24

**explained** 6:2

**extensions** 11:5

---

**F**

**fact** 19:13

**farm** 18:13

**fascia** 12:6

**fast** 5:23 23:9

**fast-forward**
21:21

**figure** 15:10

**filed** 16:17

**filing** 15:4

**find** 13:21,23

**fine** 9:11 10:24
21:11

**front** 21:16

---

**G**

**gave** 16:4

**General** 21:15

**Goldammer** 5:20,
21 8:5 10:20,23
11:3 15:21 16:1
17:3 22:21 23:1,8,
17

**Good** 5:3

**Graves** 5:8,15 8:3
10:18,22 11:1

**Griffin** 17:5,10,18

**guess** 18:11
19:10 21:9

---

**H**

**habit** 7:17

**hail** 17:19,21
20:11 22:13

**hailstorm** 15:16
16:5,9

**hailstorms** 14:9

**handle** 13:17

**handled** 13:11,14

**Hands** 21:15

**happened** 22:4

**happy** 22:14

**hate** 11:23 13:2

**head** 7:7

**headshake** 7:24

**headshakes** 7:18

**hear** 7:6

**Helping** 21:14

**Holdings** 11:7,11

**home** 18:23

**huh-uh** 7:19

**husband** 8:21
9:13,16 17:15

---

**I**

**ice** 21:4

**imperative** 7:9

**indentations**
21:24

**initial** 14:22,25

**insurance** 5:22
6:3,4 11:19,21,22
12:2,10,13 13:7,
11 14:2 15:5 23:3

**insured** 10:23

**involved** 13:17
15:6 16:21 18:4

**involving** 14:23

---

**J**

**Jones** 10:6 11:6,
10 12:1 13:4
18:16 19:3,4,14,
18 20:9,18

**July** 21:14

**jumped** 22:12

**June** 15:9

---

**K**

**kind** 7:7 18:25
19:20

**knowing** 22:20

**knowledge** 10:17
16:12

---

**L**

**lawsuit** 15:4
16:17

**lawyer** 6:1 13:17
23:12

**LCR** 5:5

**leaked** 21:5

**leaks** 20:12,13,19
21:3

**lease** 8:23 11:5,
13,14 12:10 18:16
19:13

**leave** 17:14 18:4
23:6

**lessee** 11:17

**licensed** 5:4

**Lindsey** 5:4

**listen** 10:24

**live** 20:6

**LLC** 11:7

**load** 14:24

**long** 9:2

**looked** 9:7

**loss** 15:8 16:23 17:18

**lot** 22:10

**Louise** 5:8,15

**M**

**made** 12:9

**mail** 20:2

**maintain** 11:18

**make** 6:15 7:10 23:2,13,14

**March** 5:6

**mark** 15:21 22:21

**marked** 15:23 17:1 22:23

**means** 6:2 7:2

**memory** 12:8 19:20

**mid-1980s** 8:15 9:14 10:14 14:11

**miles** 20:7

**mind** 6:25

**monthly** 19:25

**months** 18:9,11

**morning** 5:3

**Motor** 11:6,10

**N**

**names** 13:22

**natural** 7:17

**negotiated** 13:9, 12

**no.'** 7:21

**note** 22:12

**notice** 7:6

**Number** 15:24 17:2 22:24

**O**

**oath** 5:8,10 6:1,5, 23 7:1 23:15

**objection** 5:10,12

**occurred** 17:19

**October** 16:23

**on-site** 10:9 19:23

**opportunity** 6:15

**owned** 12:4,15 14:7,19

**Owners** 5:22 15:5 23:2

**P**

**paid** 8:17

**panelling** 21:24

**paragraph** 11:16, 17

**part** 13:6 14:2 15:4

**parties** 5:9

**passed** 17:15

**people** 7:17 13:3 14:14 22:9

**perfectly** 9:11 21:11

**period** 14:19 19:4 20:22 21:1

**Perry** 5:4

**personal** 16:12

**phone** 13:20

**photograph** 22:13,14

**photographs** 21:22 22:10

**physically** 20:3

**pick** 19:24 20:8

**point** 9:19

**policy** 6:3

**present** 10:15

**pretty** 5:23

**print** 17:14

**Prior** 21:18

**problem** 11:2

**proceedings** 23:20

**proceeds** 13:11 14:2

**process** 6:12 22:19

**proof** 12:12 15:8 16:23 17:18

**property** 8:1,9,18, 20,23,25 9:14,17 10:8 11:18,22 12:5,16,19 13:10, 18 14:8,9,20,23 15:18 16:8 17:22, 25 18:18,20

**purchase** 8:8,20

**put** 11:4,13 18:25 21:15

**Q**

**question** 7:8,12, 14 16:3 17:9

**questions** 5:20 6:4 16:2

**R**

**ran** 9:1,16,22 21:1

**read** 15:13,15 17:7 23:11

**real** 13:19

**recall** 16:4,6 20:9 21:6

**receive** 13:6

**received** 11:20

**refresh** 19:20

**related** 12:9,10

**relates** 22:17

**remember** 6:20 8:10,11,17 12:5, 16,18 13:21,22 14:8,12,21 15:2,4, 6,7,16,19,20 16:8 17:21 20:18,20 21:2

**rent** 19:24 20:3,8

**repaired** 21:8

**repetitive** 16:3

**replaced** 10:15, 19

**replacing** 12:5,16

**reporter** 5:3,4 6:13 7:24 23:12

**Reporting** 5:5

**represent** 5:22

**represented** 6:8

**requests** 12:9,12

**resealed** 10:19

**response** 12:12

**result** 16:13 17:25

**retired** 18:23

**review** 6:15 23:13

**reviewed** 17:12

**roof** 10:15

**rude** 7:23

**run** 8:24 9:2,21

**running** 9:24

**S**

**SAITH** 23:19

**sale** 13:6,18,24

**screen** 11:6 21:16

**send** 23:12

**sense** 7:10

**Services** 5:5

**shop** 12:17

**short-circuit** 22:18

show 14:23

side 12:6

siding 12:5

sign 23:11

signed 15:10,11 17:4

signing 17:10

sir 6:17 7:11 8:7, 19,22 9:15,18 10:4,13,20 11:15 12:3,8,14,18,21, 24 13:5 15:3,19 17:11 20:5 21:20 22:4 23:16

small 17:14

soffits 12:6

sold 12:20,25 13:3,4 18:18

son 17:14 18:5 20:17 23:5

Songstad 6:9

sound 11:23 16:2 19:9

sounds 9:13

spatter 22:13

splatter 22:13

split 14:2

state 5:11

stay 10:24 18:12

stayed 18:23,24 19:3

stop 7:15 9:24

stopped 20:8

storm 16:14 17:25 20:11 21:4 22:3, 17 23:3

street 13:2

stuff 13:13 16:21 18:3

submitted 6:5

suffered 17:25

summer 21:14

swear 23:14

sworn 5:17

---

**T**

takes 17:15 18:13

taking 14:24

talk 8:1

telling 20:10

Ten 20:7

tenant 9:20 11:18, 21 12:11

testified 5:17

testifies 17:18

testify 17:24 22:2

testimony 10:25

thing 7:3 19:12

things 6:24 14:14

thought 8:12

tiles 12:17

till 21:2

time 5:7,9,24 9:9, 23 10:14 14:19 19:4 21:1 23:18

times 14:8,10,13

today 5:23,25 6:9 7:1 8:2 10:25 21:18 23:10,18

Today's 5:6

token 7:14

told 16:4 23:9,10

track 19:10,11

transaction 13:15

transactions 15:7

transcript 6:15

trim 12:6

trouble 7:8

truth 7:2 22:7

turn 20:16

turned 9:20

turning 7:7

type 6:13 7:24 13:9

---

**U**

uh-huh 7:18 8:7 11:10,11 19:15 21:5

understand 6:6 7:8,14,15,25 17:13

understanding 12:19

understood 7:13 18:15

---

**V**

videoconference 5:11

---

**W**

weeks 19:5,9,19, 22

William 17:5

wind 17:19,21

Winfred 13:24

word 6:21

worked 18:21,22 19:3,18

working 19:22

writing 15:13,15

wrong 19:1

wrote 11:13

---

**Y**

year 8:10,12 12:9

years 8:11 9:4,5, 6,7,17 10:1,3 12:4,15 14:7

yes,' 7:20

you-all 8:23

---

**Z**

zoom 15:9